# BURROW-GILES LITHOGRAPHIC COMPANY *v.* SARONY.

IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

Submitted December 13th, 1883.—Decided March 17th, 1884.

*Copyright.*

It is within the constitutional power of Congress to confer upon the author, inventor, designer, or proprietor of a photograph the rights conferred by Rev. Stat. § 4952, so far as the photograph is a representation of original intellectual conceptions.

The object of the requirement in the act of June 18th, 1874, 18 Stat. 78, that notice of a copyright in a photograph shall be given by inscribing upon some visible portion of it the words Copyright, the date, and the name of the proprietor, is to give notice of the copyright to the public ; and a notice which gives his surname and the initial letter of his given name is sufficient inscription of the name.

Whether a photograph is a mere mechanical reproduction or an original work of art is a question to be determined by proof of the facts of originality, of intellectual production, and of thought and conception on the part of the author ; and when the copyright is disputed, it is important to establish those facts.

This was a suit for an infringement of a copyright in a photograph of one Oscar Wilde. The defence denied the constitutional right of Congress to confer rights of authorship on

the maker of a photograph; and also denied that the surname of the proprietor with the initial letter of his given name prefixed to it (" N. Sarony ") inscribed on the photograph was a compliance with the provisions of the act of June 18th, 1874, 18 Stat. 78. The essential facts appear in the opinion of the court. The judgment below was for the plaintiff. The writ of error was sued out by the defendant.

*Mr. David Calman* for plaintiff in error.

*Mr. Augustus T. Gurlitz* for defendant in error.

MR. JUSTICE MILLER delivered the opinion of the court.

This is a writ of error to the Circuit Court for the Southern District of New York.

Plaintiff is a lithographer and defendant a photographer, with large business in those lines in the city of New York.

The suit was commenced by an action at law in which Sarony was plaintiff and the lithographic company was defendant, the plaintiff charging the defendant with violating his copyright in regard to a photograph, the title of which is " Oscar Wilde No. 18:" A jury being waived, the court made a finding of facts on which a judgment in favor of the plaintiff was rendered for the sum of $600 for the plates and 85,000 copies sold and exposed to sale, and $10 for copies found in his possession, as penalties under section 4965 of the Revised Statutes.

Among the findings of fact made by the court the following presents the principal question raised by the assignment of errors in the case :

" 3. That the plaintiff about the month of January, 1882, under an agreement with Oscar Wilde, became and was the author, inventor, designer, and proprietor of the photograph in suit, the title of which is 'Oscar Wilde No. 18,' being the number used to designate this particular photograph and of the negative thereof; that the same is a useful, new, harmonious, characteristic, and graceful picture, and that said plaintiff made the same at his place of business in said city of New York, and within the United States, entirely from his own

original mental conception, to which he gave visible form by posing the said Oscar Wilde in front of the camera, selecting and arranging the costume, draperies, and other various accessories in said photograph, arranging the subject so as to present graceful outlines, arranging and disposing the light and shade, suggesting and evoking the desired expression, and from such disposition, arrangement, or representation, made entirely by the plaintiff, he produced the picture in suit, Exhibit A, April 14th, 1882, and that the terms ' author,' 'inventor,' and ' designer,' as used in the art of photography and in the complaint, mean the person who so produced the photograph."

Other findings leave no doubt that plaintiff had taken all the steps required by the act of Congress to obtain copyright of this photograph, and section 4952 names photographs among other things for which the author, inventor, or designer may obtain copyright, which is to secure him the sole privilege of reprinting, publishing, copying and vending the same. That defendant is liable under that section and section 4965 there can be no question, if those sections are valid as they relate to photographs.

Accordingly, the two assignments of error in this court by plaintiff in error, are :

1. That the court below decided that Congress had and has the constitutional right to protect photographs and negatives thereof by copyright.

The second assignment related to the sufficiency of the words " Copyright, 1882, by N. Sarony," in the photographs, as a notice of the copyright of Napoleon Sarony under the act of Congress on that subject.

With regard to this latter question, it is enough to say, that the object of the statute is to give notice of the copyright to the public, by placing upon each copy, in some visible shape, the name of the author, the existence of the claim of exclusive right, and the date at which this right was obtained.

This notice is sufficiently given by the words " Copyright, 1882, by N. Sarony," found on each copy of the photograph. It clearly shows that a copyright is asserted, the date of which is 1882, and if the name Sarony alone was used, it would be a

sufficient designation of the author until it is shown that there is some other Sarony.

When, in addition to this, the initial letter of the christian name Napoleon is also given, the notice is complete.

The constitutional question is not free from difficulty:

The eighth section of the first article of the Constitution is the great repository of the powers of Congress, and by the eighth clause of that section Congress is authorized:

" To promote the progress of science and useful arts, by securing, for limited times to authors and inventors, the exclusive right to their respective writings and discoveries."

The argument here is, that a photograph is not a writing nor the production of an author. Under the acts of Congress designed to give effect to this section, the persons who are to be benefited are divided into two classes, authors and inventors. The monopoly which is granted to the former is called a copyright, that given to the latter, letters patent, or, in the familiar language of the present day, *patent right.*

We have, then, copyright and patent right, and it is the first of these under which plaintiff asserts a claim for relief.

It is insisted in argument, that a photograph being a reproduction on paper of the exact features of some natural object or of some person, is not a writing of which the producer is the author.

Section 4952 of the Revised Statutes places photographs in the same class as things which may be copyrighted with "books, maps, charts, dramatic or musical compositions, engravings, cuts, prints, paintings, drawings, statues, statuary, and models or designs intended to be perfected as works of the fine arts." " According to the practice of legislation in England and America," says Judge Bouvier, 2 Law Dictionary, 363, " the copyright is confined to the exclusive right secured to the author or proprietor of a writing or drawing which may be multiplied by the arts of printing in any of its branches."

The first Congress of the United States, sitting immediately after the formation of the Constitution, enacted that the " author or authors of any map, chart, book or books, being a

citizen or resident of the United States, shall have the sole right and liberty of printing, reprinting, publishing and vending the same for the period of fourteen years from the recording of the title thereof in the clerk's office, as afterwards directed." 1 Stat. 124, 1.

This statute not only makes maps and charts subjects of copyright, but mentions them before books in the order of designation. The second section of an act to amend this act, approved April 29, 1802, 2 Stat. 171, enacts that from the first day of January thereafter, he who shall invent and design, engrave, etch or work, or from his own works shall cause to be designed and engraved, etched or worked, any historical or other print or prints shall have the same exclusive right for the term of fourteen years from recording the title thereof as prescribed by law.

By the first section of the act of February 3d, 1831, 4 Stat. 436, entitled an act to amend the several acts respecting copyright, musical compositions and cuts, in connection with prints and engravings, are added, and the period of protection is extended to twenty-eight years. The caption or title of this act uses the word copyright for the first time in the legislation of Congress.

The construction placed upon the Constitution by the first act of 1790, and the act of 1802, by the men who were contemporary with its formation, many of whom were members of the convention which framed it, is of itself entitled to very great weight, and when it is remembered that the rights thus established have not been disputed during a period of nearly a century, it is almost conclusive.

Unless, therefore, photographs can be distinguished in the classification on this point from the maps, charts, designs, engravings, etchings, cuts, and other prints, it is difficult to see why Congress cannot make them the subject of copyright as well as the others.

These statutes certainly answer the objection that books only, or writing in the limited sense of a book and its author, are within the constitutional provision. Both these words are susceptible of a more enlarged definition than this. An author in

that sense is "he to whom anything owes its origin; originator; maker; one who completes a work of science or literature." Worcester. So, also, no one would now claim that the word writing in this clause of the Constitution, though the only word used as to subjects in regard to which authors are to be secured, is limited to the actual script of the author, and excludes books and all other printed matter. By writings in that clause is meant the literary productions of those authors, and Congress very properly has declared these to include all forms of writing, printing, engraving, etching, &c., by which the ideas in the mind of the author are given visible expression. The only reason why photographs were not included in the extended list in the act of 1802 is probably that they did not exist, as photography as an art was then unknown, and the scientific principle on which it rests, and the chemicals and machinery by which it is operated, have all been discovered long since that statute was enacted.

Nor is it to be supposed that the framers of the Constitution did not understand the nature of copyright and the objects to which it was commonly applied, for copyright, as the exclusive right of a man to the production of his own genius or intellect, existed in England at that time, and the contest in the English courts, finally decided by a very close vote in the House of Lords, whether the statute of 8 Anne, chap. 19, which authorized copyright for a limited time, was a restraint to that extent on the common law or not, was then recent. It had attracted much attention, as the judgment of the King's Bench, delivered by Lord Mansfield, holding it was not such a restraint, in *Miller* v. *Taylor*, 4 Burrows, 2303, decided in 1769, was overruled on appeal in the House of Lords in 1774. Ibid. 2408. In this and other cases the whole question of the exclusive right to literary and intellectual productions had been freely discussed.

We entertain no doubt that the Constitution is broad enough to cover an act authorizing copyright of photographs, so far as they are representatives of original intellectual conceptions of the author.

But it is said that an engraving, a painting, a print, does em-

body the intellectual conception of its author, in which there is novelty, invention, originality, and therefore comes within the purpose of the Constitution in securing its exclusive use or sale to its author, while the photograph is the mere mechanical reproduction of the physical features or outlines of some object animate or inanimate, and involves no originality of thought or any novelty in the intellectual operation connected with its visible reproduction in shape of a picture. That while the effect of light on the prepared plate may have been a discovery in the production of these pictures, and patents could properly be obtained for the combination of the chemicals, for their application to the paper or other surface, for all the machinery by which the light reflected from the object was thrown on the prepared plate, and for all the improvements in this machinery, and in the materials, the remainder of the process is merely mechanical, with no place for novelty, invention or originality. It is simply the manual operation, by the use of these instruments and preparations, of transferring to the plate the visible representation of some existing object, the accuracy of this representation being its highest merit.

. This may be true in regard to the ordinary production of a photograph, and, further, that in such case a copyright is no protection. On the question as thus stated we decide nothing.

In regard, however, to the kindred subject of patents for invention, they cannot by law be issued to the inventor until the novelty, the utility, and the actual discovery or invention by the claimant have been established by proof before the Commissioner of Patents; and when he has secured such a patent, and undertakes to obtain redress for a violation of his right in a court of law, the question of invention, of novelty, of originality, is always open to examination. Our copyright system has no such provision for previous examination by a proper tribunal as to the originality of the book, map, or other matter offered for copyright. A deposit of two copies of the article or work with the Librarian of Congress, with the name of the author and its title page, is all that is necessary to secure a copyright. It is, therefore, much more important that when the supposed author sues for a violation of his copyright, the

existence of those facts of originality, of intellectual production, of thought, and conception on the part of the author should be proved, than in the case of a patent right.

In the case before us we think this has been done.

The third finding of facts says, in regard to the photograph in question, that it is a " useful, new, harmonious, characteristic, and graceful picture, and that plaintiff made the same  . . . entirely from his own original mental conception, to which he gave visible form by posing the said Oscar Wilde in front of the camera, selecting and arranging the costume, draperies, and other various accessories in said photograph, arranging the subject so as to present graceful outlines, arranging and disposing the light and shade, suggesting and evoking the desired expression, and from such disposition, arrangement, or representation, made entirely by plaintiff, he produced the picture in suit."

These findings, we think, show this photograph to be an original work of art, the product of plaintiff's intellectual invention, of which plaintiff is the author, and of a class of inventions for which the Constitution intended that Congress should secure to him the exclusive right to use, publish and sell, as it has done by section 4952 of the Revised Statutes.

The question here presented is one of first impression under our Constitution, but an instructive case of the same class, is that of *Nottage* v. *Jackson*, 11 Q. B. D. 627, decided in that court on appeal, August, 1883.

The first section of the act of 25 and 26 Victoria, chap. 68, authorizes the *author* of a photograph, upon making registry of it under the copyright act of 1882, to have a monopoly of its reproduction and multiplication during the life of the author.

The plaintiffs in that case described themselves as the authors of the photograph which was pirated, in the registration of it. It appeared that they had arranged with the captain of the Australian cricketers to take a photograph of the whole team in a group; and they sent one of the artists in their employ from London to some country town to do it.

The question in the case was whether the plaintiffs, who owned the establishment in London, where the photographs

were made from the negative and were sold, and who had the negative taken by one of their men, were the authors, or the man who, for their benefit, took the negative. It was held that the latter was the author, and the action failed, because plaintiffs had described themselves as authors.

Brett, M. R., said, in regard to who was the author: "The nearest I can come to, is that it is the person who effectively is as near as he can be, the cause of the picture which is produced, that is, the person who has superintended the arrangement, who has actually formed the picture by putting the persons in position, and arranging the place where the people are to be— the man who is the effective cause of that."

Lord Justice Cotton said: "In my opinion, 'author' involves originating, making, producing, as the inventive or master mind, the thing which is to be protected, whether it be a drawing, or a painting, or a photograph;" and Lord Justice Bowen says that photography is to be treated for the purposes of the act as an art, and the author is the man who really represents, creates, or gives effect to the idea, fancy, or imagination.

The appeal of plaintiffs from the original judgment against them was accordingly dismissed.

These views of the nature of authorship and of originality, intellectual creation, and right to protection confirm what we have already said.

*The judgment of the Circuit Court is accordingly affirmed.*